UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Civil No. 2:25-cv-_____

| | |
|---|---|
| MR. and MS. DOE, individually and on behalf of JANE DOE, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CAPE ELIZABETH SCHOOL DEPARTMENT, | ) ) ) |
| Defendant. | ) |

## COMPLAINT

Plaintiffs, Mr. and Ms. Doe, individually and as agents for their adult daughter, Jane Doe, under a power of attorney, complain against the Cape Elizabeth School Department as follows:

## PARTIES AND JURISDICTION

1.  This is an action commenced under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.,* supplemented by Maine's laws regarding the education of exceptional students, 20-A M.R.S.A. § 7001, *et seq.*, and their respective implementing regulations.

2.  Plaintiffs Mr. and Ms. Doe, and their adult daughter, Jane Doe, are residents of Cape Elizabeth, Maine. Jane received a high school diploma from the Grove School in Connecticut, where she was unilaterally placed by her parents, in August 2025.

3. Defendant Cape Elizabeth School Department ("Cape Elizabeth") is the local education agency responsible for providing a free appropriate education to students with disabilities who are residents of Cape Elizabeth.

4. This action seeks judicial review of an administrative decision issued on August 26, 2025, by a Maine Department of Education hearing officer pursuant to the IDEA, 20 U.S.C. § 1415(i)(2). The hearing officer erroneously ruled that (i) Cape Elizabeth met its obligations under the IDEA to provide Jane a free appropriate public education from February-August 2023; (ii) Cape Elizabeth met its obligations under the IDEA to offer Jane an appropriate Individualized Education Program ("IEP") and placement for 2023-2024 and 2024-2025; and (iii) Jane was not entitled to any compensatory remedy; and (iv) Jane's parents were not entitled to be reimbursed for any of the costs associated with Jane's placement at the Grove School.

5. In seeking to reverse the hearing officer's order under the IDEA, Plaintiffs are parties "aggrieved by the findings and decision" of a due process hearing officer within the meaning of the IDEA, 20 U.S.C. § 1415(i)(2)(A).

6. This Court's subject matter jurisdiction is based upon the IDEA, 20 U.S.C. §§ 1415(i)(2)(A), 1415(i)(3)(A)–(C), and 28 U.S.C. § 1331 (federal question jurisdiction).

7. The IDEA administrative hearing in this case involved a dispute between the parties concerning Cape Elizabeth's failure to provide Jane Doe with appropriate services and placement under the IDEA. The IDEA requires that each

eligible child with a disability receive a free appropriate public education ("FAPE")
that "emphasizes special education and related services designed to meet their
unique needs." 20 U.S.C. § 1400(d)(1)(A).

## FACTS COMMON TO ALL COUNTS

8.  In 2014, Jane's parents adopted her, along with her three younger
siblings, after completing a one-year "foster-to-adopt" arrangement. All four
children had experienced significant childhood neglect and trauma.

9.  Given her history of childhood trauma, adoption, and attachment issues,
Jane has been receiving weekly therapy continuously since age six.

10.  The family lived in California during Jane's elementary school years.
Jane initially received accommodations through a Section 504 Plan due to anxiety
and ADHD, which affected her ability to focus. During this time, she made no real
friends at school and had no play dates or party invitations. Jane frequently
misperceived social interactions, acted out at home due to negative interactions at
school, and began to sexualize male peers toward the end of elementary school.

11.  Jane faced turmoil at school beginning in fifth grade due to social
difficulties and her inability to form and sustain healthy friendships. She lacked the
social and coping skills to succeed in a large mainstream public middle school.

12.  For seventh grade (2019-2020), Jane's parents moved her to a small
private school, where she continued to struggle with peer relations. Jane finished
seventh grade with remote instruction due to the COVID-19 lockdown that began in

March 2020. She fared even worse with the removal of daily structure and became more emotionally volatile and hostile with her parents and siblings.

13. During spring 2020, Jane had to be hospitalized twice due to high-risk crisis behaviors, significant mood dysregulation, aggression at home, and threatened self-harm.

14. Upon her discharge in June 2020, Jane's parents enrolled her in a wilderness program in Idaho for continued therapeutic treatment.

15. After her completion of the wilderness program, it was recommended that she be placed in a residential therapeutic setting. For eighth grade (2020-2021) Jane moved to a therapeutic residential placement in Utah, where she remained throughout the 2020-2021 school year.

16. In 2021, however, staff at her Utah placement recommended that she work toward stepping down to an academic boarding school with therapeutic supports.

17. Although Jane began ninth grade (2021-2022) at her placement in Utah, her parents worked with her California school district, the San Jose Unified School District ("San Jose"), concerning her next placement.

18. In August 2021, San Jose began to process Jane's initial referral for eligibility under the IDEA.

19. In September 2021, San Jose arranged for its school psychologist to evaluate Jane. Her report explains that Jane was anxious, pessimistic, angry,

impulsive, and task avoidant, and had a poor self-concept and tendency to experience extreme mood swings and encounter difficulty with peer relationships.

20.  Despite an average IQ, Jane's test results indicated "difficulties with all aspects of executive function, including inhibitory control, self-monitoring, emotion regulation, flexibility, and cognitive regulatory functions, including [the] ability to sustain working memory and to initiate, plan, organize, and monitor problem-solving."

21.  The psychologist concluded that "[Jane] demonstrates difficulties with social/emotional functioning that impact her ability to function in a general education setting."

22.  San Jose found Jane IDEA-eligible under the categories of Emotional Disturbance (primary) and Other Health Impairment (secondary). San Jose further determined that Jane required educational placement in a residential therapeutic setting due to her unique needs.

23.  Jane's first IEP, issued by San Jose on October 21, 2021, lists her placement setting as a "Residential Facility." The IEP stated that, while Jane was performing academically at grade level with accommodations, she "has difficulty forming healthy relationships and her anxiety, depression, and history of childhood trauma interfere with her ability to make and maintain friendships."

24.  The IEP contained three separate goals in the social-emotional area, the two most important of which were identifying and reporting trauma responses and utilizing self-regulatory activities. The San Jose IEP Team discussed the first of

these goals, describing it as focusing on Jane's "emotions and communications," and being a "goal about reciprocating friendships," which was and has remained Jane's most significant functional deficit and area of need.

25. San Jose and Jane's parents ultimately agreed that Jane would transition to a placement at Mountain Springs Preparatory Academy ("MSPA") with public funding, beginning in January 2022. MSPA is a "step-down" co-educational private boarding school for 30-40 students, which features a supportive, but not therapeutic, environment.

26. As the IEP Team technically could not place Jane at MSPA, San Jose and Jane's parents entered into a Settlement Agreement to fund Jane's placement at MSPA from January 1 to September 1, 2022.

27. Initially, MSPA appeared to be a good placement fit for Jane, as she attended classes and developed a good relationship with her MSPA advisor.

28. In spring 2022, Jane's parents decided to move their family to Maine.

29. San Jose's special education director wrote a letter summarizing Jane's situation on June 21, 2022, confirming that her IEP Team had evaluated MSPA and determined both that MSPA was providing "real educational benefit to [Jane] and is appropriate to meet her unique [needs] documented in her IEP," and that MSPA is "the appropriate program for her to make progress in her academic and social emotional goals."

30. Jane's parents communicated with Del Peavey, then Cape Elizabeth's director of special education, in July 2022, providing him with Jane's evaluation

report from San Jose and the director's letter. San Jose sent Jane's educational records to Cape Elizabeth.

31.  On August 19, 2002, after communicating with Jane's parents, Mr. Peavey sent them a proposed agreement for Cape Elizabeth to continue funding Jane's residential placement at MSPA, as San Jose had been doing.

32.  Jane's parents accepted this offer on August 23, 2022, so Jane could continue at MSPA for tenth grade. They hoped she eventually could transition to living at home with her family and attending Cape Elizabeth High School ("CEHS").

33.  Under the agreement, Cape Elizabeth would fund Jane's continued residential placement at MSPA, up to a maximum of $10,500 per month for tuition, room/board, and counseling costs. The Agreement's term ran until Jane's discharge from MSPA, her high school graduation, or her 22nd birthday, "whichever occurs first."

34.  The agreement also provided: "Should the Student stop attending MSPA prior to receiving a regular high school diploma or turning 22, Cape Elizabeth shall schedule and hold an IEP team meeting to establish the Student's IEP and placement from the point of her departure from MSPA."

35.  Jane began tenth grade (2022-2023) at MSPA, but became emotionally flooded and overwhelmed, experiencing great distress early that school year. She began to engage in self-harm during September 2022. This prompted MSPA to recommend a short-term placement in a stabilization program known as Oasis Ascent, which offers partial hospitalization services.

36. Jane moved to Oasis Ascent to begin short-term therapeutic treatment in October 2022.

37. Meanwhile, Cape Elizabeth held an IEP Team meeting on October 21, 2022, to begin planning for Jane's eventual transition to public school.

38. Although the IEP Team created an IEP for Jane, all team members understood that this document was meant for future implementation and did not address her current educational needs, for which she had been placed residentially.

39. At the meeting, Jane's parents discussed her serious mental health issues, which included her recent self-harm behaviors and her need for Dialectical Behavior Therapy ("DBT"). The IEP services proposed by Cape Elizabeth were not what Jane needed at the time; they had been reduced to meet the capabilities of a public school setting, anticipating her eventual transition to CEHS.

40. The resulting "public school" IEP proposed for Jane's eventual transition contained goals for math, executive function skills, and social work counseling. Its proposed services consisted of specially designed instruction to support her academics for 150 minutes per week, plus 75 minutes per week of social work services.

41. Despite reviewing the San Jose IEP—which contained three different social-emotional goals—Cape Elizabeth adopted only one of those goals, involving co-regulating activities with an adult, for its "public school" IEP. It omitted the other two goals entirely.

42. After completing her treatment at Oasis Ascent, Jane returned to MSPA in late November 2022.

43. Jane's parents, hoping to pave the way for her anticipated transition to CEHS, agreed to have Danielle Grimes, a CEHS social worker, communicate with Jane's advisor at MSPA. They signed a release for that purpose, but Ms. Grimes never communicated with Jane's advisor.

44. On January 18, 2023, Parents contacted Mr. Peavey to notify him that "[Jane] is exhibiting some unsafe behaviors [at MSPA] . . . that inhibit her ability to be safe at home or in a less restrictive environment." They explained that MSPA "needed to evaluate her fit there right now—and . . . may recommend a higher level of care."

45. Jane's mother wrote: "[Jane's father] and I are open to any discussion about any of this as it is unfolding, and realize that a discussion will be necessary prior to any possible change in placement given our agreement with the Cape Elizabeth School District."

46. Mr. Peavey agreed: "We will need to have a discussion if her placement at MSPA is permanently changed. It sounds like that might be premature at this time but please keep me in the loop as things unfold."

47. Due to her deteriorating social-emotional condition and her behavior at MSPA, Jane returned to Oasis Ascent on January 27, 2023, for another short-term therapeutic stay. Her parents notified Mr. Peavey and asked for a meeting, as required by their agreement with the District.

48. Jane's parents again put Ms. Grimes in touch with Jane's therapist, this time at Oasis. They signed another release allowing Ms. Grimes to collect records from Oasis and to communicate with the therapist. Again, Ms. Grimes did not communicate with the therapist despite the release.

49. Mr. Peavey acknowledged Jane's need for a temporary placement at a higher level of care facility. He agreed to meet in person with her parents on February 15, 2023.

50. This informal meeting, however, was not an IEP Team meeting as required by the parties' agreement and by the IDEA. The meeting ended with Mr. Peavey handing Jane's parents a list of therapeutic placements in Maine and referring to things they could do for her as parents.

51. Mr. Peavey did not convene Jane's IEP Team, as required, and indicated instead that Cape Elizabeth would not be taking further steps concerning Jane's placement unless and until she was ready to transition to CEHS.

52. Jane's parents left this meeting with the (incorrect) understanding that they had sole responsibility for identifying and funding Jane's next educational placement.

53. Jane's advisor at Oasis Ascent emailed Jane's parents in March 2023, indicating that it was not realistic to place Jane at a therapeutic boarding school she required a residential treatment center ("RTC") level of care. The advisor clearly indicated that Oasis Ascent could not recommend a lower level of care.

54. Left with no placement offer from Cape Elizabeth, which failed even to convene an IEP Team meeting, Jane's parents hired a consultant and began searching for appropriate RTC-level placements where Jane could be educated.

55. They found Ironwood Maine, located in Morrill. Jane transitioned to Ironwood in March 2023 and remained there, at her parents' expense, until the start of the 2023-2024 school year. While Jane was being educated at Ironwood, the Parents kept Cape Elizabeth notified of her progress.

56. Jane's parents offered to connect Ms. Grimes with Jane's therapist at Ironwood. For a third time, they signed a release to facilitate communication. Once again, Ms. Grimes did not utilize the release to obtain therapeutic information about Jane.

57. Jane's second IEP Team meeting with Cape Elizabeth occurred on June 12, 2023. As during her October 2022 meeting, Cape Elizabeth again avoided the issue of Jane's current programming and placement needs. It focused only on what it would offer Jane for services upon her transition to CEHS.

58. Jane's Parents presented Cape Elizabeth with access to all of Jane's records and to the personnel who had worked with her, leaving it to the District to determine what could and should be done to support her transition to CEHS.

59. The resulting "public school" IEP from June 2023 is the document that governed Jane's initial programming when she started at CEHS in September 2023.

60. As Cape Elizabeth offered no therapeutic services for Jane's anticipated transition, other than one hour per week of social work services at school, her

parents located and enrolled her in an intensive outpatient program offered by Art of Awareness for 7.5 hours per week of after-school therapeutic programming.

61. In July 2023, Ryan Fairchild replaced Del Peavey as Cape Elizabeth's special education director.

62. The parties determined to have Jane start eleventh grade with her class on September 5, 2023. Cape Elizabeth offered Jane a substantially reduced academic schedule for the first semester of 2023-2024.

63. Ironwood discharged Jane on August 31, 2023, listing her active diagnoses as major depressive disorder, recurrent; ADHD; PTSD, chronic; generalized anxiety disorder; and reactive attachment disorder of childhood.

64. Per Ironwood's discharge summary: "[Jane] is stable upon discharge. [Jane's] stability can be inconsistent depending upon different factors; this is in connection to her diagnosis of RAD [reactive attachment disorder]. [Jane] does continue to use self-harm as a maladaptive coping skill." It described her prognosis as "guarded" and recommended an intensive outpatient program ("IOP").

65. In anticipation of Jane attending CEHS, her parents had lined up an IOP, required Jane to select one after-school activity, and established technology limitations, including a Bark phone with parental controls, approved contacts, and no social media access.

66. Jane began classes at CEHS on September 5, 2023. She experienced a behavioral "explosion after school" that day, breaking a glass and engaging in self-harm (four cuts on her left arm).

67. That week Jane began circumventing the parental technology limitations by utilizing the CEHS school email system to engage in sexualized conversations with a male peer. CEHS did not detect these communications.

68. The next week, Jane's parents notified CEHS that "[Jane] has unfortunately, though not unexpectedly, [had] started to form an unhealthy attachment with a boy . . . at school. Unhealthy because she is getting tunnel vision, texting inappropriately (sharing very private information and getting really worried when he doesn't text back right away.)"

69. Although Jane started IOP services during the week of September 11, 2023, she attended those therapeutic sessions for only two weeks before quitting.

70. Ms. Grimes, the CEHS social worker, never communicated with the IOP and never sought a release to do so.

71. After Ms. Grimes' session with Jane on Tuesday, September 12, Jane had no school therapeutic services for the next two weeks.

72. Jane's behaviors outside of school began to ramp up. prompting Ms. Grimes to email her parents that she was "sorry to hear that things have been a little rough at home. . . . [Jane] mentioned that you are all having a conversation about her commitment around the IOP program, she is really dreading this conversation."

73. Jane's mother explained that they were "working with [Jane] on a therapy plan—she had agreed to an IOP program but last week told them (in no uncertain terms) she couldn't do it anymore."

13

74. Ms. Doe noted that "[Jane] is pretty much waiting for the other shoe to drop and be 'sent back' to residential and so almost all of her reactions to this kind of thing are through that lens."

75. In late September, Jane began using her CEHS school email account to engage in sexualized communications with a male peer from her past who was not an approved contact. Again, CEHS did not detect these communications.

76. Jane's ramped-up behaviors were beginning to have a negative effect on her younger siblings. This included a late-September incident at the bus stop when Jane slapped her sister on the face in front of everyone. Jane also was engaging in verbal escalations at home, including multiple threats to kill herself.

77. Jane began telling her parents that she could not go to CEHS because she did not fit in; she reported being bullied by peers about her weight and her need for adult support.

78. On Monday, October 2, Ms. Grimes noted that Jane was "emotionally dysregulated, tearful" and checked boxes on her session form for "depression symptoms, social conflict, family conflict, maladaptive coping, and low self-esteem."

79. Ms. Grimes wrote: "Student was agitated and frustrated when [she] arrived to session. Reported that rumors were starting to spread about her and she was feeling really anxious and depressed that things that have happened in the past, are no[w] repeating. Student reports that she hates it here at school and hates it here at home and is willing to do anything to get back into residential programming." Jane's parents had observed similar behavior from Jane at home.

80. Ms. Grimes was concerned that Jane had gone from an intensive therapeutic placement to a far less restrictive setting without proper therapeutic supports in place, but she made no recommendations for increased therapeutic services through the IEP.

81. Jane came back to Ms. Grimes later on October 2 to report that "she was feeling very tired, overwhelmed, and in need of a break so she could regulate herself and return to class." Ms. Grimes then emailed Jane's parents: "Emotionally, she is in a rough spot. She stated that she is experiencing some social distress with regard to the boy she was talking with, feels like her depression is intense now, and is having a very hard time adjusting to life outside residential treatment. I am concerned that she might be feeling on shaky ground and she might be motivated to engage in past behaviors in an effort to return to a familiar setting."

82. The next day, Ms. Grimes had an unscheduled visit from Jane, who was struggling to regulate her emotions and having difficulties with peers in her math class. When Ms. Grimes spoke with Jane's mother that day, she learned that Jane had punched a hole in the wall of the house, attempting to pick a fight with other family members, and was doing everything in her power to go back into residential status.

83. Jane's behavior had become increasingly hostile with her siblings, including frequent swearing and flipping them off. Jane's parents warned her that she would face consequences if this behavior continued.

84. That weekend Jane continued to misbehave at home and received a behavioral consequence for yelling, swearing, and flipping off her brother. She responded with highly elevated behaviors, including screaming and breaking glasses; she called the police to report that she was suicidal and homicidal. The incident resulted in a visit to the emergency room at Maine Medical Center.

85. Despite the lack of any assistance from Cape Elizabeth in obtaining therapeutic resources, Jane's parents succeeded in locating Kerry Bennett, LCPC, to provide individual counseling for Jane.

86. On October 10, 2023, Ms. Bennett began twice weekly therapy with Jane, focusing on her reactive attachment disorder and chronic PTSD. Ms. Bennett determined that Jane's major challenge is in the social domain, especially navigating attachments with peers and family members. Jane's very low self-esteem leads her to outsource her sense of self-worth through peer acceptance, causing her to be intensely preoccupied with making friendships at school.

87. In their sessions, Ms. Bennett worked with Jane on the pragmatic skills needed to establish typical, healthy relationships. Jane needed to generalize those skills across settings, which was a significant challenge for her.

88. Jane tended to obsess and over-attach with peers, pushing them away, then misinterpreting this as abandonment. The distress resulting from her inability to form and maintain peer relationships spilled over as anger and behaviors.

89. Despite the IEP's terms, Ms. Grimes did not meet with Jane after her hospital visit until the following week.

90. The annual IEP Team meeting held the next day, October 18, was Jane's first since arriving at CEHS. Special Education Director Fairchild opted not to attend this meeting, sending the assistant principal instead.

91. At the meeting, Cape Elizabeth focused the discussion on Jane's academic performance. The only discussion of her disability-related emotional struggles involved Ms. Grimes's recommendation to reduce Jane's social work services to just 45 minutes per week, despite Jane's obvious social-emotional struggles.

92. Although Jane's parents appreciated the plan for Jane's academic supports at CEHS, they did not understand the lack of focus on the significant functional issues related to her emotional disability. It was becoming clear to Jane's parents that her emotional and functional needs were overwhelming the home and public school settings she was in.

93. Ms. Doe emailed Ms. Bennett on October 24: "[O]ver the weekend, [Jane's father] and I came to the conclusion that unfortunately, we need to proceed with plans for [Jane] to get additional help outside the home . . . ." They asked their educational consultant to explore potential "Plan B" options in case Jane's placement at CEHS and resulting behaviors at home did not improve, while they continued to support and encourage Jane to succeed in her current situation.

94. On October 25, Cape documented that Jane skipped two of her academic classes. Then, over the ensuing weekend, one of Jane's friends with whom she had been in social conflict the prior week, took her own life.

95. The peer's death unsettled Jane, as she had had an intense relationship and recent falling out with the peer. This became the focus on Jane's next session with Ms. Bennett.

96. Although Ms. Grimes documented a "check-in" with Jane on November 1, she made no further session notes that week and never contacted Ms. Bennett to coordinate Jane's therapy despite the Team's determination that "Ms. Grimes will collaborate with [Jane's] therapist."

97. CEHS held Jane's second monthly check-in on Monday, November 6. Jane attended this meeting with her parents, her special education teacher, and Ms. Grimes. At that meeting, Jane's parents learned from Ms. Grimes that Jane had been skipping classes even prior to her peer's death by suicide.

98. Ms. Huchel's email to staff relayed the group's discussion about trying to get Jane back into her classes and documented that "[Jane] shared with us that she doesn't like this school, she doesn't want to be here, and she's not motivated to do the work because she's unhappy. That's a tough way to feel every day."

99. The following weekend, after complaining that she did not fit in at CEHS, Jane left the family home without notice. This prompted a search by her parents, who found her at a neighbor's home and brought her home.

100. The next morning, Jane repeated the behavior and received a behavioral consequence. She exploded behaviorally, more violently than the prior month. She threw a kitchen timer, threatened to harm herself and others, and called the police. This led to another visit to Maine Medical Center, which admitted Jane overnight.

101. Ms. Doe emailed CEHS concerning the hospitalization, explaining that Jane was emphatically expressing her inability to live at home and attend CEHS.

102. Maine Medical Center discharged Jane on Monday, November 13. Her parents, meanwhile, worked to secure an out-of-district placement for Jane that could stabilize her emotionally. They emailed Cape Elizabeth for advice on holding an IEP Team meeting given what had occurred, but Mr. Fairchild took the position that no IEP Team was necessary.

103. Despite Jane's deteriorating emotional condition, Cape Elizabeth did not schedule an IEP Team meeting or ever propose additional therapeutic services to support Jane's placement at CEHS. The District was content to permit Jane's parents to shoulder the burden of identifying and funding her next placement.

104. Jane's parents arranged for her to take a leave from CEHS to attend Blue Ridge Wilderness in Georgia, a short-term therapeutic placement, in the hope that her behaviors could be stabilized. Jane remained at Blue Ridge from mid-November 2023 through early February 2024.

105. Cape Elizabeth initiated no inquiries about Jane, but the Parents provided intermittent updates. Their January 2024 email explained that "[a]t this time there are a lot of unknowns as we track how [Jane] responds week to week."

106. Likely fearing legal action, Mr. Fairchild determined in late January 2024 to send his in-house psychological expert, Alina Perez—who had yet to be involved in Jane's case, despite her complex profile and transition from residential treatment—to evaluate and observe Jane at Blue Ridge.

107. Once again, Jane's parents cooperated with Cape's request, signing a consent for Dr. Perez to assess Jane and to communicate with both Blue Ridge and their educational consultant.

108. Dr. Perez reported: "Overall, the results across settings suggest that [Jane's] depressive symptoms are a main concern across settings. In school they appear through increased physical symptoms and fears, while at home they manifest through increased levels of aggressive behavior, anxiety and functional impairment." Dr. Perez explained that "the current data seem to suggest that anxiety is a predominant focus of her emotional state. [Jane] shared she often experiences anxiety and worry. She worries about social situations and arguments with friends."

109. At discharge, Blue Ridge recommended that Jane transition to a therapeutic residential placement, diagnosing her with generalized anxiety disorder, persistent depressive disorder, other specified trauma and stressor related disorder, with attachment and adoption issues, and ADHD-combined presentation.

110. Jane's Blue Ridge counselor wrote: "I remain Moderately concerned regarding her risk for relapsing in the areas of social difficulties, depressive symptoms, and anxiety if she were to return to her home environment after completing our program. . . . I believe that if any long-term gains are to be made, she must be in a residential or therapeutic boarding school setting after Blue Ridge so that she can practice and internalize the tools she learned at Blue Ridge. Returning to her home environment, even with intensive outpatient therapy or

school accommodations, would most certainly result in significant regression and a return to her previous level of functioning. [Jane] remains highly susceptible to external pressures and has not yet internalized the ability to implement the coping strategies she has learned at Blue Ridge without a structured setting. Further, I would strongly recommend that she go directly from Blue Ridge to her next placement. Returning home, even for a few days, would place her at great risk for regression in functioning and would undo much of the progress she has made at Blue Ridge Therapeutic Wilderness."

111. In spite of these explicit recommendations, at the IEP Team meeting held on February 9, 2024, Cape Elizabeth contradicted Blue Ridge, asserting that "Cape Schools are able to educate [Jane] and will be ready for her return when she finishes her time at Blue Ridge Wilderness Center."

112. Cape Elizabeth focused on Jane's lack of a disciplinary record at CEHS, although school discipline had never been a factor in Jane's need for out-of-district placement. When Jane's parents disagreed, Mr. Fairchild offered only to send them a copy of the IDEA procedural safeguards: "If the parents have a different opinion, then they can do what they need to do." Although Jane's parents specifically inquired about their options, including mediation, Mr. Fairchild refused to answer their procedural questions.

113. Jane's mother later composed a reply to Cape Elizabeth's written notice from the meeting, explaining: "We clearly stated in the meeting that we disagreed with the determination that [Jane] would be best placed in the school." She further

explained that "[Jane's] focus of her treatment with her therapist was around the difficulty of the social relationships she was having at school. Her difficulty at home was related to the peer connections—she was blaming us or sort of taking out on us all of the anxiety and difficulty she was having at school—it was blowing up at home, but it was all related to the relationships and anxiety at school. . . . We were trying in the meeting to help people understand that she was unable to manage at home because she was needing significantly more support around the social emotional elements of school. We felt Cape could have been a great place for her and stated this, but she could not be at home because she needed much more professional support. . . . The dysregulation at home was stemming primarily from social relationships and anxiety at school and was impacted by her attachment challenges in a way that required more professional support than either the school or we as parents were able to provide."

114. In an email exchange following the February meeting, Jane's parents explained that they were "working on next steps for [Jane] focused on getting her where she needs to be as she is winding down [at Blue Ridge], as you know. We welcome further conversation with you about planning for [Jane], but we also understand that you may have said all you feel necessary at this point and we don't want to waste your time."

115. Mr. Fairchild's response was unhelpful given Jane's significant therapeutic needs: "I know that both of you are trying to figure out next steps.

Please know that CEHS and the district are ready to welcome [Jane] back into the public school at any time."

116. Without any viable placement option from Cape Elizabeth and with the Blue Ridge discharge looming, Jane's parents had to scramble to identify a therapeutic educational placement willing to admit Jane. They ultimately succeeded in securing a trial admission for Jane at the Grove School in Connecticut, with a 90-day probationary period.

117. Jane matriculated to the Grove School on February 19, 2024. Grove is a year-round, co-educational therapeutic boarding school for adolescents in grades 7-12 who face emotional and/or learning challenges that have hindered their ability to adjust successfully in their home, school, or community environments.

118. All Grove teaching staff are Connecticut-certified and the school awards Connecticut-approved high school diplomas. Grove provides individual, group, and milieu therapeutic services, in addition to traditional academics. It also provides round-the-clock supervision, with varying levels of earned freedoms, as well as a full-time "Administrator on Duty" program to support students.

119. Grove students all have an Advisor and Case Manager, and participate in a full school day (7:55am-3:00pm), followed by a minimum of two activity periods. The Connecticut Department of Education has approved Grove as a special education placement. Grove also is accredited by the New England Association of Schools and Colleges.

120. Jane's parents notified Cape Elizabeth of her placement at Grove, but received a response from Mr. Fairchild saying only, "Thank you for letting me know. I hope the transition went well for [Jane]." The very next day, the CEHS guidance office began communicating with Jane's parents to sign a form that would disenroll Jane from Cape Elizabeth Schools, but they declined to do so.

121. By May 2024, Jane had successfully completed her 90-day probation and Grove confirmed that she was appropriately placed and could continue through completion of twelfth grade in August 2025.

122. Jane's parents approached Cape Elizabeth about holding a follow-up IEP Team meeting to determine if the district would support her appropriate placement at Grove. Mr. Fairchild ultimately replied that he could not gather the team and suggested meeting in the fall of 2024.

123. Jane's parents invited three Grove staff members to participate in the fall 2024 IEP Team meeting. Grove also composed a letter summarizing Jane's experiences since February. That letter explains that "[Jane] receives individual therapy twice a week for 45 minutes, participates in weekly group therapy, and benefits from 24/7 holistic care in a therapeutic milieu setting," and that she "needs this level of social and emotional support to be successful."

124. The letter described that since arriving at Grove, "[Jane] has made notable progress in addressing these challenges through both individual therapy and the therapeutic milieu," although when "overwhelmed, she can become emotionally flooded, which impacts her ability to focus and stay motivated."

125. The letter also stated that while "[h]er anxiety can interfere with her ability to concentrate, affecting her performance in the classroom, homework completion, test preparation, and test-taking", Grove confirmed she had "stabilized her daily attendance, begun fostering more positive relationships with peers and adults, and explored new activities and interests. However, she continues to struggle with motivation, follow-through, emotional regulation, maladaptive coping strategies, and managing her technology use. Frequent interventions by school staff have been essential to her progress, and she is working on enhancing her self-advocacy skills."

126. The letter concluded by explaining that while Jane "has made significant progress in treatment and in the school environment, we believe her continued success depends on her ability to remain at the Grove School. Returning home, attending therapy, and attending a day school would likely compartmentalize her challenges and risk a regression to previous unsafe and risky behaviors. The risks associated with such a transition are considerable, and a structured environment like Grove is critical to maximizing [Jane's] chances of success."

127. None of the representatives from Grove believed that Jane was ready to return to placement in a public mainstream high school, despite the progress she had shown during her first eight months at Grove.

128. In preparation for the fall 2024 IEP Team meeting, Cape Elizabeth again sent its expert, Dr. Perez, to observe Jane. It also prepared a draft IEP, with Ms. Grimes (who twice had reduced Jane's service time while she was at CEHS and

skipped the Team meeting with Grove) writing to Mr. Fairchild, "I know that we wanted to increase the [social work] service time to match that of the residential program." His response was "LOVE IT!! Great work."

129. Despite Jane's need for and success in Grove's residential program, Cape Elizabeth continued to ignore the profound impact of her emotional disability, offering only that she should return to CEHS with minimal services.

130. Jane's mother told the Team that Jane's behaviors at home during the fall of 2023 were due to relationship issues with peers from CEHS: "She was maintaining during the day, but reacting at home." She emphasized that Grove was working well for Jane both academically and functionally: "This is the first time she's saying that she's where she wants to be." Mr. Fairchild replied by falsely asserting that "Grove's therapeutic milieu isn't substantially different from what is happening at CEHS."

131. The IEP proposed by Cape Elizabeth is written only for placement at CEHS. Jane's parents rejected this proposal as inappropriate and confirmed their intent to seek reimbursement for Jane's placement at Grove.

132. Unlike at Cape Elizabeth, where Jane's social work goal was extremely limited and ignored the functional needs resulting from her disability, Jane worked at Grove on a number of functional skill goals that she needed to master for a successful transition to adulthood. These included gaining the ability to establish healthy boundaries and personal values in peer relationships, improving her self-awareness and self-concept, improving her coping skills, forming heathy peer

relationships, communicating successfully with family members, and preparing for transition to a college placement. Although none of these goal areas ever appeared in a Cape Elizabeth IEP, Ms. Grimes acknowledged that these were Jane's needs.

133. Jane experienced some setbacks while at Grove, including one incident in which she shared inappropriate selfies with male peers, but Grove responded appropriately in helping her respond to and overcome these challenges, both by supporting her with emotional regulation and imparting skills for dealing with such difficulties in the future.

134. By October 2024, Jane was participating enthusiastically in Grove's Key Club and Crafter's Club. She became part of her first real friend group and even appeared in her first drama production at Grove in March 2025, which proved to be a "meaningful and positive" experience for her. Jane ceased engaging in self-harm, as her coping skills improved and she found ways to avoid having her emotions escalate out of control. Jane also successfully participated in an internship with her aunt's home healthcare business.

135. Jane's parents noticed many positive changes in Jane's ability to negotiate the social world and the expectations of a school environment.

136. Jane graduated from Grove with a high school diploma in August 2025, and she now attends Central Maine Community College, where her studies are focused on criminal justice and she receives on-campus support.

137. As relief, Jane's parents sought reimbursement of the costs related to her placement at Grove from February 2024 through August 2025.

## **Due Process Hearing**

138. A hearing officer appointed by the Maine Department of Education held a hearing on the Does' due process complaint on May 19-23 and June 17, 2025.

139. At the hearing, the Does argued that, when Jane's placement ended at MSPA in March 2023, Cape Elizabeth had had a duty to develop an IEP and offer Jane an educational placement capable of addressing her needs.

140. Both the IDEA and the parties' agreement in 2022 required Cape Elizabeth to hold an IEP Team meeting once MSPA dismissed Jane, for the purpose of designing an IEP and placement for her, but Cape Elizabeth never offered her any placement and never even convened an IEP Team meeting for this purpose. This failure denied Jane a free appropriate public education for six months. The Does' sought a compensatory remedy for this violation.

141. The hearing officer disagreed, ignoring both the IDEA and the express agreement between the parties to hold an IEP Team meeting upon Jane's dismissal from MSPA, writing that Jane had "unfortunately never remained in one place for very long" and that Jane's "clearly personal crisis concerns reported by Parents did not require convening an IEP Team meeting."

142. The hearing officer committed legal error in not recognizing Cape Elizabeth's direct violation of Jane's rights under the IDEA by failing to convene the IEP Team and offer her a therapeutic placement for six months during 2023.

143. The Does also argued that Cape Elizabeth had repeatedly failed to offer Jane an appropriate IEP and placement during 2023-2024, thereby entitling the

family to reimbursement for the costs associated with her placement at Grove. The hearing officer erred in rejecting these arguments as well, concluding without foundation that because Jane was "not a behavioral challenge in school" and could perform academically, her social and emotional problems were segregable from her educational needs. This conclusion was erroneous as the IDEA requires school districts to fund therapeutic residential placements when a student with a complex emotional disability requires consistent instructional and therapeutic interventions to experience meaningful educational progress, both academically and functionally.

144. The hearing officer's erroneous conclusion on this issue runs contrary to longstanding First Circuit case law stating that social or emotional problems can be segregated from a student's educational needs only when such problems occur exclusively outside the school context. The evidence at the hearing demonstrated that such segregation does not apply in this case, as Jane's social-emotional deficits frequently impacted her relationships and behaviors in the school environment, which then spilled over to negative behaviors at home.

145. Rejecting the Does' arguments, the hearing officer found that they were not entitled to any compensatory remedy and denied them reimbursement of the costs associated with Jane's placement at rove School. This conclusion was in error.

## COUNT I
### (Review of Due Process Determination:
### IDEA and 20-A M.R.S.A. § 7207-B)

146. Plaintiffs repeat the allegations contained in paragraphs 1-145.

147. Federal and state special education laws authorize the Court to conduct judicial review of IDEA administrative decisions and "to grant such relief as the court determines is appropriate." This authority includes the power to reverse or vacate erroneous portion of a hearing officer's order.

148. For the reasons outlined above, the hearing officer erred as a matter of law and fact in ruling against the Does by determining that Cape Elizabeth did not violate the IDEA's FAPE requirement by failing to convene an IEP Team meeting and failing to offer Jane an appropriate IEP from March to August 2023.

149. For the reasons outlined above, the hearing officer erred as a matter of law and fact in ruling against the Does by determining that Cape Elizabeth's IEP and placement offers for 2023-2024 and 2024-2025 provided Jane with a FAPE.

150. For the reasons outlined above, the hearing officer erred as a matter of law and fact in ruling against the Does by determining that the Does were not entitled to any compensatory or reimbursement relief under the IDEA.

WHEREFORE, Plaintiff Jane Doe respectfully requests that the Court enter judgment in her favor against Cape Elizabeth School Department, and specifically to provide her with the following relief:

a)    to reverse and/or vacate the hearing officer's order, finding that Cape Elizabeth violated Jane's right to a FAPE under the IDEA from March through August 2023; and that Cape Elizabeth violated Jane's right to a FAPE under the IDEA during either or both 2023-2024 and 2024-2025;

b)    to award Plaintiffs compensatory relief and reimbursement of the expenses associated with Jane's placement at the Grove School from February 2024 through August 2025;

c)    to award Plaintiffs reimbursement of their costs, including their reasonable attorney's fees and litigation expenses, and such further relief as the Court may deem just and proper.

Dated:  November 18, 2025

Respectfully submitted,

*/s/ Richard L. O'Meara*
Richard L. O'Meara
*E-mail:  romeara@mpmlaw.com*

Counsel for Plaintiffs

MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207) 773-5651